UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JASON A STUMM, | ) | |
| MATTHEW W STUMM, | ) | |
| BRIAN T HELMER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-04296-JMS-MJD |
| | ) | |
| TOWN OF PITTSBORO, | ) | |
| CHRISTI PATTERSON, | ) | |
| LIEUTENANT SCOTT KING, | ) | |
| CARRI WEBER, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

The three Plaintiffs in this case – Matthew Stumm, Jason Stumm, and Brian Helmer – are current or former Pittsboro police officers who allege that the Chief of Police, the Assistant Chief of Police, and a Captain with the neighboring Plainfield Police Department recorded or intercepted their conversations without their knowledge and without a court order in violation of the Fourth Amendment to the United States Constitution and the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq.* Presently pending before the Court is a Motion for Summary Judgment filed by Defendants. [Filing No. 41.] For the reasons that follow, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

I.
**STANDARD OF REVIEW**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear,

1

whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome-determinative. *Montgomery v. American Airlines Inc*., 626 F.3d 382, 389 (7th Cir. 2010). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717

(7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trustees of Indiana University,* 870 F.3d 562, 573-74 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### BACKGROUND

The following factual background is set forth pursuant to the standard discussed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A. The Parties

Matthew ("Matt") Stumm became a Pittsboro Police Department ("PPD") Officer in 2005 and worked in that capacity throughout the relevant time period in this case. [Filing No. 45-4 at 4.]

Jason Stumm, Matt Stumm's brother, worked for the PPD from 2012 to 2017, initially as an arson investigator and later as a reserve officer. [Filing No. 45-6 at 2.] Jason Stumm resigned from the PPD on February 8, 2017. [Filing No. 45-6 at 2.]

Brian Helmer worked as a reserve officer for the PPD from 2008 to 2010 and as a full-time officer at the PPD from January through November 2017. [Filing No. 45-5 at 3.]

During the relevant time period, Christi Patterson was the Chief of Police for the PPD, [Filing No. 45-1 at 5], and Scott King was the Assistant Chief at the PPD[1], [Filing No. 45-2 at 4].

Carri Weber was employed by the Plainfield Police Department and was assigned to conduct an investigation into Matt Stumm in 2017. [Filing No. 45-1 at 47.]

## B. PPD's Camera System

The PPD's office consists of a lobby with a receptionist's window in it, [Filing No. 43-1 at 5; Filing No. 43-1 at 27], and features one door on the left wall and another on the right wall, [Filing No. 43-1 at 5-10].



[Filing No. 43-1 at 27; Filing No. 43-1 at 28; Filing No. 43-1 at 30.] The door on the right wall leads to town hall, [Filing No. 43-1 at 7; Filing No. 43-1 at 28], while the door on the left wall leads to the remainder of the PPD offices, [Filing No. 43-1 at 10; Filing No. 43-1 at 30]. Through the latter door is the PPD interview room, which doubled as Major King's office (hereinafter, "Major King's office"), [Filing No. 45-1 at 16-18], and the office that at one time belong to Matt

---

[1] Although he is listed in the caption of this case as "Lieutenant Scott King," in his deposition, King testified that he was initially a Lieutenant but then became a Major. [Filing No. 45-2 at 7.] As he is now a Major, the Court will refer to Scott King as "Major King," notwithstanding his title in the case caption.

Stumm.  [Filing No. 43-1 at 10; Filing No. 43-1 at 30.]  It was not uncommon for the public to walk through the door that leads to Major King's office if it was open.  [Filing No. 43-1 at 11.]

In 2006, the PPD installed a camera system in the department.  [Filing No. 45-1 at 14.]  In 2010, the PPD replaced the 2006 camera system and had one camera installed in the PPD lobby and another in Major King's office.  [Filing No. 45-1 at 16-18.]  Both of the 2010 cameras had audio and video capabilities and had to physically be turned on before recordings would commence.  [Filing No. 45-1 at 18-19.]

After the 2010 camera began malfunctioning, the PPD had a new camera system installed on or around November 17, 2016.  [Filing No. 45-1 at 18-21; Filing No. 43-5 at 3.]  The cameras were placed in the same locations the 2010 cameras had been:  one was installed in the PPD lobby and the other was in the PPD interview room/Major King's office.  [Filing No. 45-1 at 22].  The 2016 cameras were motion activated.  [Filing No. 45-1 at 21.]  If the camera in the lobby was activated and the squad room door was open, then the cameras picked up an audio recording of what was said in the squad room.  [Filing No. 45-1 at 30.]  Recordings from the 2016 cameras are stored on a drive; once the drive is full, the oldest recordings are recorded over.  [Filing No. 43-5 at 5.]  The drive holds approximately 2-3 months of footage.  [Filing No. 43-5 at 5.]  After the 2016 cameras were installed, Captain Patterson and Major King conducted a test that revealed that if the door between the lobby and the rest of the PPD office was closed, the camera would not pick up words that were spoken in the rest of the PPD office because it would turn off a few seconds after being motion activated.  [Filing No. 45-1 at 21.]

In addition to the PPD cameras, the town of Pittsboro had cameras on various streets and in the parks.  [Filing No. 43-4 at 5.]  Matt Stumm was aware of cameras placed around town but was unaware of what the cameras looked like.  [Filing No. 45-4 at 5-6.]  He had used video footage

in a case he worked on, and for some time had an app on his phone that allowed him to enter a password and view the camera footage. [Filing No. 45-4 at 5-6.] Jason Stumm was aware that there were cameras recording throughout the town of Pittsboro but was unaware of what the cameras looked like. [Filing No. 45-6 at 3.] Brian Helmer was also aware there were cameras recording throughout the town of Pittsboro. [Filing No. 45-5 at 3.]

### C. February 6, 2017 Meeting and Subsequent Investigation

On February 6, 2017, Chief Patterson and Major King had a meeting with Matt Stumm. [Filing No. 45-4 at 19.] During the meeting, Chief Patterson and Major King told Matt Stumm that they had been informed that Matt Stumm was looking for discrepancies in Major King's time cards. [Filing No. 45-4 at 19.] The group agreed that Matt Stumm would follow up with the other officers and apologize to them. [Filing No. 45-4 at 19; Filing No. 45-1 at 37.]

The next day, in the course of investigating video footage from one of the cameras PPD had placed around town, Chief Patterson discovered a recording of Matt Stumm making negative comments about herself and Major King. [Filing No. 45-1 at 41.] Upon reviewing five or six other tapes from December 2016 through January 2017, Chief Patterson became concerned that Matt Stumm had carried a folder containing her timesheets into city hall and had driven an underage rider in his squad car at some point. [Filing No. 45-1 at 42-44.] In the conversations that were recorded, Matt Stumm spoke in a normal tone of voice, rather than a whisper. [Filing No. 43-1 at 17-18.] For some of the conversations, Matt Stumm was in his office with the door open and the door to the lobby was also open. [Filing No. 43-1 at 16.] Major King also viewed the videos. [Filing No. 45-1 at 45.] Prior to viewing the videos, neither Chief Patterson nor Major King sought a search warrant or court order. [Filing No. 45-1 at 53.]

On February 20, 2017, Matt Stumm was told he was under investigation and was placed on administrative leave, and his canine partner and take-home vehicle were taken from him. [Filing No. 45-4 at 17-18.] When he returned from leave, he lost his office and was told it was needed for an investigation office. [Filing No. 45-4 at 18.]

The PPD then initiated an investigation into Matt Stumm. [Filing No. 45-2 at 14.] PPD contacted the Plainfield Police Department, who appointed Captain Weber as an investigator. [Filing No. 45-2 at 47.] Chief Patterson then provided Captain Weber with certain audio recordings from the PPD cameras and transcripts of the same. [Filing No. 45-3 at 12.] Captain Weber listened to the recordings as part of her investigation. [Filing No. 45-3 at 12.] Captain Weber also interviewed Matt Stumm and informed him that some of his conversations at the police department had been recorded. [Filing No. 45-4 at 9.] Based on those recordings, Captain Weber found some violations of PPD policies. [Filing No. 45-3 at 16.] Captain Weber did not interview Jason Stumm or Mr. Helmer as part of her investigation. [Filing No. 45-3 at 23.]

Captain Weber then presented her findings to Chief Patterson. [Filing No. 45-3 at 16.] Specifically, in her report dated May 25, 2017, Captain Weber concluded that "with the video that was recorded," Matt Stumm violated the following PPD policies:

03.04.01(1) Insubordination- Improper conduct-On video Lt. Stumm states to Officer Crouch "I want to give you a heads up and between you and I there is no leadership."

There is also discussion about Chief never changing her oil in her car to Officer Webber and discussion of the chief needing remedial driving training for how many times she has had crashes.

Another discussion to Officer Webber that Lt. Stumm has an issue that there is no concern for the department by Chief Patterson.

There is a discussion between Officer Webber and Lt. Stumm about the Chief taking time off for surgeries and Major King taking time off for a pipe broke in his house.

There are several discussions on video about the Chief and Major where Lt. Stumm is speaking to subordinates about issues with both ranking officers. This is a clear violation of 03.04.01(1) Insubordination.

03.05.01 Professional Conduct-Improper conduct- Lt. Stumm discusses his issues with Chief Patterson with Jason Love on video. Lt. Stumm states, "let's do this route then Jason. You back me when they go to fire my ass. You know it's going to happen." Jason Love also states to Lt.

Stumm "sounds like you need to get a hold of this department and get it straightened out." This violates 03.05.01 Professional Conduct.

By violating above policies and Lt. Stumm also violates other department policies:

1.1 Obedience to rules of conduct.

1.3 Adherence to department rules.

1.9 Duty read, understand and comply with orders.

1.11(f)(h)(i) Conduct unbecoming.

2.1 Performance of duty.

2.4 Conduct of behavior.

3.2 Supporting fellow employees.

Lt. Stumm speaking in a derogatory manner to officers of lower rank and civilians in reference to Major King and Chief Patterson violates policy for an Officer of his rank.

[Filing No. 45-7 at 4-5.]

Matt Stumm was disciplined for having a juvenile rider in his vehicle. [Filing No. 45-4 at 18.] He was not disciplined for anything that was contained in an audio recording. [Filing No. 45-4 at 18.]

On November 16, 2017, Plaintiffs filed suit against the Town of Pittsboro acting by and through the Department, Chief Patterson in her official and individual capacities, and Major King and Captain Weber in their individual capacities. [Filing No. 1.] Following the Court's dismissal without prejudice of Mr. Helmer's and Jason Stumm's claims against Captain Weber, [Filing No. 24], Plaintiffs filed the operative Amended Complaint, [Filing No. 28]. Therein, with respect to Pittsboro, Plaintiffs allege that the town maintains an unconstitutional and illegal policy of intercepting, recording, and disclosing conversations. [Filing No. 28 at 6.] Additionally, Plaintiffs contend that Chief Patterson and Major King's actions in intercepting, recording, and disclosing their private conversations constitute an illegal search in violation of the Fourth Amendment and the Federal Wiretap Act. [Filing No. 28 at 6.] Plaintiffs further allege that Captain Weber violated the Federal Wiretap Act by using and disclosing Plaintiffs' recorded conversations. [Filing No. 28 at 6.] On September 7, 2018, Defendants filed a Motion for Summary Judgment, [Filing No. 41], and that Motion is now ripe for the Court's review.

### III.
### DISCUSSION

In support of their Motion for Summary Judgment, Defendants make one primary argument – that all of Plaintiffs' claims fail because Plaintiffs had no reasonable expectation of privacy in the lobby of the police department or the areas surrounding it. Thereafter, Defendants make several alternative arguments, each of which the Court will consider in turn.

**A. Expectation of Privacy under the Fourth Amendment and the Federal Wire Tap Act**

First, Defendants argue that Plaintiffs "cannot demonstrate a reasonably objective expectation of privacy" under the Fourth Amendment because the conversations at issue "took place in an area where they could be overheard and recorded by the security camera in the public lobby of the Police Department," while the door to the police department was unlocked and the doors to the secure area of the police department and Matthew Stumm's office were open. [Filing No. 42 at 9-10.] Similarly, Defendants argue that because Plaintiffs cannot show that they had a reasonable expectation of privacy in the conversations at issue, they "do not meet the Federal Wiretap Act definition of oral communication." [Filing No. 42 at 10-11.] Specifically, Defendants contend that:

> [t]he conversations took place in a public building, where they could be overheard in the public lobby. Plaintiffs did not lock exterior doors to preclude others from entering the lobby and listening to the conversation. They did not close the door from the lobby to the secure area of the police department, nor did they close the door to [Matt] Stumm's office. They did not whisper or take any action that would prevent others from hearing their conversation.

[Filing No. 42 at 11-12.]

In response, Plaintiffs contend that they "did not believe that their conversations" were being recorded "because Chief Patterson told them they were not recorded." [Filing No. 44 at 6.] Plaintiffs argue that they "were entitled to rely on assurances they received from King and Patterson that their conversations would not be recorded." [Filing No. 44 at 8.] In addition, Plaintiffs argue that their "expectation of privacy when they are alone in their office was objectively reasonable." [Filing No. 44 at 8.]

In their reply brief, Defendants reiterate their argument that "there is no objectively reasonable expectation of privacy in conversations that are had in the open and are not protected

against being overheard." [Filing No. 46 at 3.]  As such, Defendants argue that each of Plaintiffs'

claims fail and that the Court need not reach the issue of whether the recordings were made

intentionally.  [Filing No. 46 at 4.]

Defendants are correct that the statute at issue – the Federal Wiretap Act – is linked with

the Fourth Amendment.  In fact, commentators have noted that the Federal Wiretap Act, also

known as Title III of the Omnibus Crime Control and Safe Streets Act or the Electronic

Communications Privacy Act, "evolved out of the shadow of the Supreme Court's Fourth

Amendment jurisprudence."  Charles Doyle, Cong. Research Servs., "Privacy: An Overview of

Federal Statutes Governing Wiretapping and Electronic Eavesdropping," 1 (Oct. 9, 2012).

In 1967, the Supreme Court decided the landmark case of *Katz v. United States*, 389 U.S.

347 (1967), in which:

> the Court was asked to decide whether a Fourth Amendment violation occurred
> when an eavesdropping device was attached to a public telephone booth.  In
> reaching its conclusion that a violation occurred, the Court said that 'the Fourth
> Amendment protects people, not places.'  After *Katz*, courts around the country
> focused on whether a person's 'reasonable expectation of privacy' was violated to
> determine when a Fourth Amendment violation occurred.

*United States v. Rahman*, 805 F.3d 822, 830 (7th Cir. 2015) (citations omitted).

The next year, in 1968, "Congress enacted the Federal Wiretap Act for the dual purpose of

protecting the privacy of wire and oral communications, and delineating the conditions under

which such communications may be intercepted."  *Abbott v. Vill. of Winthrop Harbor*, 205 F.3d

976, 980 (7th Cir. 2000) (citations omitted); *see also United States v. Torres*, 751 F.2d 875, 881

(7th Cir. 1984) (noting that the Federal Wiretap Act was "[e]nacted in the wake of *Katz v. United

States*").  The Act provides that any person who "(c) intentionally discloses, or endeavors to

disclose, to any other person . . . or (d) intentionally uses, or endeavors to use, the contents of any

wire, oral, or electronic communication, knowing or having reason to know that the information

was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection" shall be found in violation of the statute and subject to civil or criminal penalties. 18 U.S.C. § 2511. The Act then defines "oral communication" as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." 18 U.S.C. § 2510.

Herein lies the intersection of the Federal Wiretap Act and Fourth Amendment jurisprudence: the definition of "oral communication" in the Federal Wiretap Act "was intended to parallel the 'reasonable expectation of privacy' test created by the Supreme Court in *Katz v. United States*." *Matter of John Doe Trader No. One*, 894 F.2d 240, 242 (7th Cir. 1990) (citing S. Rep. No. 1097, *reprinted in* 1968 U.S.C.C.A.N. 2112-2274). "Thus, Congress limited its protection of 'oral communications' under [the Federal Wiretap Act] to those statements made where 'first, a person [has] exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as "reasonable.""" *Id.* at 242 (quoting *Katz*, 389 U.S. at 361 (Harlan, J., concurring)).

Defendants set forth a "reasonable expectation of privacy" analysis in their briefing and discuss layout of the PPD, whether certain doors were open or closed, the fact that the PPD was open to the public, and the volume of Matt Stumm's voice. It is true that "the extent to which the Fourth Amendment protects people may depend upon where those people are." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). And it is likewise true that some courts have found common areas of police departments to be areas in which officers do not have a reasonable expectation of privacy. *See, e.g.*, *Gray v. Royal*, 181 F. Supp. 3d 1238, 1254 (S.D. Ga. 2016) (holding that sheriff's office employees did not have a reasonable expectation of privacy "in a common-area of the office that is frequented by both employees and non-employees" where "inmates are permitted access to the

very space in which the recorder was placed"); *Tancredi v. Malfitano*, 567 F.Supp.2d 506, 512 (S.D.N.Y. 2008) (holding that "society is not prepared to recognize an expectation of privacy at the front desk of a police station as reasonable"). However, these cases are inapposite to this case because Matt Stumm testified that he was not in the PPD lobby when he was recorded, but rather in his office just off of the lobby with the door open, or in the squad room. [Filing No. 45-4 at 13 ("Q. Let's talk about the conversations that were recorded . . . . A. The ones that I've seen were in my office and with just two people, and then the other ones we were in the squad room. . .").] More analogous to the situation at hand is a Ninth Circuit case in which the defendants argued that a plaintiff's expectation of privacy was unreasonable given the physical characteristics of the plaintiff's office, combined with the fact that the plaintiff's office door was open. *United States v. McIntyre*, 582 F.2d 1221, 1224 (9th Cir. 1978). The Court stated that it could not "accept the argument that an open door made [the plaintiff's] expectation of privacy unreasonable" because the plaintiff "believed his office conversations to be private" and because "[a] business office need not be sealed to offer its occupant a reasonable degree of privacy." *Id.* at 1224.

McIntyre hints at, but does not explicitly discuss, the key point at issue here – like the plaintiff in *McIntyre*, Matt and Jason Stumm testified that they believed their office conversations were private, but unlike in *McIntyre*, Matt and Jason Stumm submitted evidence that this belief was based on PPD management informing them that they would not be subject to audio recording in the PPD offices. Matt Stumm testified that when the camera was installed, Chief Patterson and Major King informed him that no audio recordings would take place in the police department. [Filing No. 43-1 at 17.] Jason Stumm testified that at a subsequent department meeting in April or May 2014, Major King informed him and others that the camera had been installed in the lobby of the PPD due to the secretary not being able to see who came in the door, but that the camera

would record video only, and no audio. [Filing No. 45-6 at 3.] Jason Stumm further testified that he was informed that the squad room of the PPD was a place where officers needed to be able to feel comfortable and have discussions without feeling that they were being recorded. [Filing No. 45-6 at 3.]

Defendants' arguments ignore the Plaintiffs' evidence that PPD management informed them that they would not be subject to audio recording in the PPD offices, and what's more, Defendants' evidence contradicts Plaintiffs' evidence on this point. Major King testified that he and Chief Patterson did not tell Matt Stumm that officers were going to be recorded in the squad room, but did inform Matt Stumm that the cameras had audio capabilities. [Filing No. 45-2 at 10.] Major King then said, "[w]e tested the system to make sure that with the door closed between the squad room and the lobby that it would not be – that conversations could not be heard with that door closed . . . [but] that you could hear conversations with the door open," and that Matt Stumm was aware of these results because he was present for the tests. [Filing No. 45-2 at 10-11.] Similarly, Chief Patterson testified that she believed that all the officers at PPD knew that the building was video and audio recorded, [Filing No. 45-1 at 27], and that the officers were never told expressly that they were not being audio recorded, [Filing No. 45-1 at 28-29].

Whether these representations to Matt and Jason Stumm actually occurred is a question of material fact, as it goes to the very issue of whether the recordings in this case qualify as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." 18 U.S.C. § 2510. If Matt or Jason Stumm were explicitly told that their conversations were not being recorded, it follows that they would have "an expectation that such communication is not subject to interception" and would therefore qualify as an oral communication under the Federal Wiretap

Act. *See also Amati v. City of Woodstock*, 176 F.3d 952, 956 (7th Cir. 1999) (stating that "if the police, in order to trick people into making damaging admissions over the phone, announced that calls to and from the police department were not being recorded, and then recorded them anyway," it "would not be in the 'ordinary' course of law enforcement"). As such, the Court need not determine whether the logistical and architectural facts at issue in this case created an expectation of privacy. Defendants are not entitled to summary judgment on the expectation of privacy element of all of Plaintiffs' claims, and the Court will now consider Defendants' alternative arguments.

### B. Brian Helmer's Claims

With respect to Brian Helmer, Defendants argue that "[e]ven if the recordings fell within the protection of the Federal Wiretap Act or the Fourth Amendment, Brian Helmer has no claim to assert" because "there is no evidence that the lobby camera recorded any conversations of Brian Helmer outside of the lobby, or that Defendants listened to, used or disclosed, any such recordings." [Filing No. 42 at 12.]

Plaintiffs acknowledge that recordings of Mr. Helmer "are not part of the record" and that his "oral communications were not used or disclosed by Defendants," but Plaintiffs nevertheless contend that "the mere fact that recordings of him were not preserved does not mean that an intrusion into his privacy didn't occur." [Filing No. 44 at 9.] Instead, Plaintiffs argue that Mr. Helmer's conversations "were necessarily intercepted every time he entered the building and spoke," and that each interception is a violation of the Federal Wiretap Act. [Filing No. 44 at 9.]

In their reply brief, Defendants argue that Mr. Helmer "was required to come forward with evidence demonstrating that his objectively private conversations were recorded," and that "there was no evidence that [Mr.] Helmer's private conversations were recorded." [Filing No. 46 at 4.]

15

As the Seventh Circuit has repeatedly stated, summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (quoting *Schacht v. Wisconsin Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. 249-50.

In this case, Mr. Helmer's evidence is not sufficiently probative to raise a genuine issue of material fact as to whether his conversations were intercepted. For example, he testified that he is a plaintiff in this matter because after the internal affairs investigation, Matt Stumm informed Mr. Helmer that he was on one of the video recordings. [Filing No. 45-5 at 4.] He further testified that his concern was that there may be other recordings out there and that he had conversations with his wife "in there" and conversations in the squad room. [Filing No. 45-5 at 4.] However, Mr. Helmer has presented no evidence that the PPD lobby camera was activated and that any conversation of his was intercepted. The Seventh Circuit's decision in *McCann v. Iroquois Memorial Hospital* initially appears to support Mr. Helmer's position by noting that plaintiffs seeking relief under the Federal Wiretap Act "need not produce direct evidence of the intentional interception; for often the only way to prove that a stealthy interception occurred is through circumstantial evidence." 622 F.3d 745, 751-52 (7th Cir. 2010). But *McCann* turned on whether there was sufficient evidence to show that the interception was intentional, not upon whether there was an interception to begin with. The *McCann* court noted that "[n]ecessary to all of the plaintiffs' claims . . . is an intentional interception." *Id.* at 751-52. The same can be said here – necessary to Mr. Helmer's claim is an intentional interception, and the evidence put forth by Mr. Helmer is not sufficiently probative to raise a genuine issue of material fact as to whether his

conversations were intercepted. As such, Defendants' Motion for Summary Judgment is **GRANTED** as to Mr. Helmer's claims against them.

### C. Plaintiffs' Claims against Captain Weber

Defendants also argue that Captain Weber "did not use and disclose the recordings within the meaning of 18 U.S.C. § 2510 and therefore the claims against her should be dismissed." [Filing No. 42 at 12.] Specifically, they argue that the undisputed facts demonstrate that Captain Weber "did not violate the Federal Wiretap Act when she listened to or discussed the recordings in the internal affairs investigation" because "[t]here was nothing about the recording that gave [her] reason to suspect the recording was improper or illegal." [Filing No. 42 at 13.]

In response, Plaintiffs contend that Captain Weber "should have known that the audio recordings were illegal" because they "obviously weren't obtained by a search warrant because Matt was not suspected of criminal misconduct that would establish probable cause for a search warrant." [Filing No. 44 at 10.] Additionally, Plaintiffs argue that Captain Weber "should have known that audio recordings of the secured area of the PPD building were made for the suppression of criticism and therefore not a lawful purpose under the Federal Wiretap Act." [Filing No. 44 at 11.]

Defendants reply that Captain Weber testified "that she knew recordings inside a police department were common because the Plainfield Police Department had cameras that recorded audio and video throughout the department." [Filing No. 46 at 4.]

Here again, the Seventh Circuit's decision in *McCann* is instructive. *McCann* took place in a hospital and involved a dictation machine that recorded a conversation in which an employee made inflammatory comments about her employer. *McCann*, 622 F.3d at 747-49. The dictation was sent to a transcriber and the hospital trustees, all of whom were under the impression that the

dictation machine had been accidentally left on. *Id*. at 749. The Seventh Circuit held that even if the recording had been made illegally, the hospital trustees "could be liable only if they had reason to know the recording was made illegally and they used or disclosed the recording." *Id*. at 753 (quoting *Williams v. Poulos,* 11 F.3d 271, 284 (1st Cir. 1993) ("It is not enough to know that the conversation was intercepted; the defendant must also be able to tell that none of the statutory exceptions apply."). Noting that "[o]n summary judgment we make reasonable inferences in the plaintiffs' favor," the Court held that the evidence in *McCann* was "too thin a reed on which to base a reasonable inference that [defendants] knew the recording was illegally obtained." *Id*. at 754. As such, the Seventh Circuit affirmed the lower court's grant of summary judgment in favor of the hospital trustees. *Id*. at 754.

Similarly, in this case Captain Weber testified that she had no concerns that the recordings she received as part of the internal affairs investigation were illegally obtained due to the fact that her department has cameras recording audio and video throughout. [Filing No. 45-3 at 13-14.] In contrast, Plaintiffs presented no evidence other than their own conjecture that Captain Weber knew or should have known that the recordings were illegally obtained. Additionally, Plaintiffs present no evidence whatsoever that Captain Weber was on notice that Matt or Jason Stumm were told they were not being recorded. Based on the same principles set forth by the Seventh Circuit in *McCann*, Plaintiffs' mere speculation is "too thin a reed on which to base a reasonable inference" that Captain Weber knew the recording was illegally obtained. 622 F.3d at 754. As such, Defendants' Motion for Summary Judgment is **GRANTED** as to Plaintiffs' claims against Captain Carri Weber.

**D. Whether the PPD Lobby Recording was Intentional**

Defendants next argue that because the camera was placed in the lobby, any conversations occurring in areas outside of the lobby were recorded inadvertently. [Filing No. 42 at 14.] As such, Defendants contend that the recordings at issue in this case were not intercepted intentionally, such that the interceptions violated the Federal Wiretap Act. [Filing No. 42 at 14.]

In response, Plaintiffs argue that "a jury could infer" that Chief Patterson knew that the cameras at issue had the ability to record inside the secure area of the PPD and that she was monitoring the cameras for statements of criticism or disloyalty. [Filing No. 44 at 12.]

Defendants contend that Plaintiffs offer no evidence that would allow a jury to infer that the device was intended to make audio recordings inside the secured area of the PPD. [Filing No. 46 at 4.]

The parties do not point to any definitions of "intent" in Seventh Circuit cases; however, the Second Circuit, considering criminal charges under the Federal Wiretap Act, offered the following definition of "intentionally" – "[b]efore you can find that the defendant acted intentionally, you must be satisfied . . . that the defendant acted deliberately and purposefully; that is, defendant's act must have been the product of defendant's conscious objective rather than the product of a mistake or an accident." *United States v. Townsend*, 987 F.2d 927, 930 (2d Cir. 1993).

Defendants do not dispute that Chief Patterson and Major King intended to intercept conversations at the PPD; rather, they argue that Chief Patterson and Major King's intent extended only to conversations that occurred in the PPD lobby and did not extend to conversations in the PPD offices. In her deposition, Chief Patterson testified that she tested activating the camera in the PPD lobby and ensuring that the camera shut off when the door to the secured portion of the PPD was closed. [Filing No. 45-1 at 21; Filing No. 45-1 at 29.] However, she did not testify about

testing the camera system with the door to the secure portion of the PPD open.  What Defendants ask this Court to do is to determine as a matter of law that Chief Patterson's and Major King's intent was limited in scope.  However, "the law presumes every man to intend the natural consequences of his acts," *United States v. Irwin*, 149 F.3d 565, 572 (7th Cir. 1998), and at the summary judgment stage, the Court is required to view the facts in the light most favorable to Plaintiffs.  A reasonable jury could find that the recordings at issue here were the product of Defendants' conscious objective and were, therefore, made with the requisite intent.  As such, Defendants' Motion for Summary Judgment is **DENIED** as to the issue of Chief Patterson's and Major King's intent.

### E.  Whether the Town Had a Policy of Recording its Officers

Lastly, Defendants argue that the town of Pittsboro is entitled to Summary Judgment on Plaintiffs' claim that it "maintains an unconstitutional and illegal policy of intercepting, recording, and disclosing the conversations of police personnel in areas that had been represented to officers as safe for private conversation," [Filing No. 28 at 6], because Pittsboro did not have such a policy, [Filing No. 42 at 15].  In addition, Defendants contend that Pittsboro cannot be held liable for proof of a single incident of discovering and listening to such recordings.  [Filing No. 42 at 15.]

In response, Plaintiffs contend they have brought this case "against the Town of Pittsboro based to a large degree on the actions of [Chief] Patterson, who was at the time and remains Chief of Police" and, as such, "is the final policy maker for [her] municipal police department."  [Filing No. 44 at 13-14.]  Plaintiffs therefore contend that they have brought "a valid *Monell* claim" against Pittsboro because "the municipality's policy or custom [was] made by those whose edicts or acts may fairly be said to represent official policy."  [Filing No. 44 at 13-14.]

In response, Defendants argue that "conversations in a public lobby do not have an objectively reasonable expectation of privacy" so "[r]ecording those conversations would not be unconstitutional and a practice of allowing such recordings would not provide a basis for an actionable *Monell* claim." [Filing No. 46 at 4.]

To establish an official policy or custom under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), "a plaintiff must show that his constitutional injury was caused by (1) the enforcement of an express policy of the [town], (2) a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) a person with final policymaking authority." *Wragg v. Vill. of Thornton*, 604 F.3d 464, 467 (7th Cir. 2010) (citations and quotations omitted). Plaintiffs contend that their case against Pittsboro is based on the third type of claim, wherein a person with final policymaking authority caused their constitutional deprivation.

Defendants declined to brief the issue of whether the chief of police is a policymaker for *Monell* purposes. However, as Plaintiffs correctly contend, the Seventh Circuit has found that "a police chief in Indiana is the final policymaker for [her] municipal police department." *Eversole v. Steele*, 59 F.3d 710, 716 (7th Cir. 1995) (citing Ind. Code § 36-8-3-3(g); Ind. Code § 36–8–3.5–11). Moreover, Chief Patterson's testimony indicates that initially installing cameras in the PPD lobby was her idea, [Filing No. 43-4 at 3 ("A. Approximately . . . 2005 or 2006 was the first camera that we installed in the police department lobby. Q. Whose idea was it to do that? A. It was something that I wanted to have done")], and that subsequent installations were done in order to comply with changes in the law, [Filing No. 45-1 at 16 (explaining that the 2010 camera replacement was to comply with a law that felony arrests should be recorded)], and in order to deal with electrical interference, [Filing No. 45-1 at 22 (discussing the 2016 installation)]. Therefore, the evidence, viewed in the light most favorable to Plaintiffs, supports a finding that Chief

Patterson had final policymaking authority over recordings made in the PPD lobby. Thus, summary judgment is **DENIED** as to Plaintiffs' *Monell* claim.

## IV.
### CONCLUSION

For the reasons explained herein, Defendants' Motion for Summary Judgment [41] is **GRANTED IN PART** and **DENIED IN PART**, as follows: (1) the Motion is **GRANTED** as to Mr. Helmer's claims against Defendants; (2) the Motion is **GRANTED** as to Plaintiffs' claims against Captain Carri Weber; and (3) the Motion is otherwise **DENIED**.

The Court requests that the Magistrate Judge confer with the parties at his earliest convenience regarding a possible resolution of these remaining matters, short of trial.

Date: 12/14/2018

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record.**